UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ROBERT A. SANCHEZ, | No. C 10-5561 YGR (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| FRANCISCO JACQUEZ, Warden, | |
| Respondent. | |

**INTRODUCTION**

Petitioner Robert A. Sanchez seeks federal habeas relief from his state convictions. For the reasons set forth below, the petition for such relief is DENIED.

**BACKGROUND**

In 2006, a Santa Clara County Superior Court jury found Petitioner guilty of murder, attempted murder and assault, consequent to which he was sentenced to a total term of 70 years-to-life, plus eight months. Evidence presented at trial showed that in 2003, Petitioner, Jorge Ayala (Ayala) and Alex Diaz (Diaz), motivated by gang loyalties, attacked Christian Jimenez (Jimenez), aged 15, and Luis L., aged 14, resulting in Jimenez's death. As stipulated at trial, Diaz alone shot and killed Jimenez during this attack. Petitioner and Ayala

were tried together. At trial, the prosecutor presented evidence showing that Petitioner and Ayala were members of "sister" Norteño gangs, whose inveterate enemies are the Surenos, to which gang Petitioner and Ayala believed the victims belonged. (Ans., Ex. 6 at 1–8.) Petitioner, Ayala, and Diaz found the victims in a park, posed as friends, and attacked them. The state appellate court concluded that the evidence showed the following about Petitioner's involvement:

> [Petitioner] directly participated in the planned attack upon the victims — singling them out, following them through the park, falsely posing as a Sureño, consulting with Diaz in the bushes, assaulting one while Diaz shot the other, then either attempting to shoot Luis or assisting Diaz in the attempt. Under those circumstances, no reasonable jury could find that unpremeditated second degree murder was reasonably foreseeable but that first degree murder (premeditated or by lying in wait) was not.

(*Id.* at 20.)

Petitioner was denied relief on state judicial review, with the exception of a few instances not relevant to the federal habeas claims.[1] This federal habeas petition followed. As grounds for federal habeas relief, Petitioner claims: (1) the trial court violated his right to an impartial jury; (2) the trial court gave two improper jury instructions;[2] (3) defense counsel rendered ineffective assistance; and (4) the admission of gang evidence violated due process.

**STANDARD OF REVIEW**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was

---

[1] The state appellate directed the trial court to modify the judgment to strike an enhancement and to resentence Petitioner under another statute, stay a term, clarify a restitution matter, and send out a copy of the abstract of judgment. (Ans., Ex. 6 at 40–42.)

[2] This is a consolidation of all Petitioner's jury instruction claims.

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court, *see Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005), which in the instant matter is the state appellate court decision on direct review (Ans., Ex. 6).

"Under the 'contrary to' clause of Section 2254(d), a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

**DISCUSSION**

**I. Impartial Jury**[3]

During deliberations, jurors reported to the trial court their concerns that defense witness Simon Ortiz, and defendant Ayala's mother Benita, were "watching them" outside the courtroom. In response, the trial court had bailiffs escort the jurors to their cars that evening. The trial court informed counsel the next day. Defense counsel moved for a mistrial, or, in the alternative, an evidentiary hearing to determine if the jurors had been prejudiced. The trial court denied the mistrial motion and the request for an evidentiary hearing, but did question the bailiff in front of counsel:

> The bailiff explained that two of the female jurors had become fearful when they observed Ortiz and one or two other people watching them get in their cars at the end of the day. Two other jurors also expressed concern. The jury also told the bailiff that Benita Ayala and her family members had been present in the jury area. The bailiff had promptly consulted with the court and, as the court explained to counsel, the court responded by arranging for the escorts. The court had directed the deputies not to say anything to the jury other than that the escort was a "routine precaution." [Defendant] Ayala's counsel informed the court that Ayala's father had been called for jury duty, which could have explained Benita Ayala's presence in the jury assembly area.
>
> In declining to hold an evidentiary hearing, the court stated, "I cannot see what an evidentiary hearing would add to our factual background. There's grave danger in that evidentiary hearing and compounds whatever problem, if any, we already have." The court noted that both Ortiz and Benita Ayala were entitled to be where the jury had observed them. "But even if the mere presence of Mr. Ortiz and Ms. Ayala amounts to some sort of witness or spectator misconduct because of them making themselves deliberately conspicuous to the jurors, there is nothing to me to suggest that one or more — the concern of one or more of the jurors was not an understandable concern or that such a concern elevates to some sort of juror misconduct or denies either defendant a fair trial."
>
> The court then had the jury brought in and the court read the following admonition: "Yesterday, I was informed by the bailiff that one or more of you

---

[3] Petitioner also contends that the jury was prejudiced by flyers handed out by protestors outside the courthouse. This claim is DENIED. First, while the flyer fairly summarizes the facts of the case (Pet. at 5), and contains Benita Ayala's name and telephone number, there is no mention of the name of the action or anyone involved. Second, the flyer declares the prosecution unjust. As such, the flyer, if it had any effect, would have influenced the jury in favor of the defense. Third, Petitioner admits that the jurors, when questioned by the trial court, denied having seen the flyer. (*Id.* at 4.). On such a record, Petitioner has not shown that the flyer or the protestors prejudiced the jury.

had noticed that Mr. Ortiz and/or other persons associated with the trial were present in the parking structure at times that you were going to and from your cars, and that Mrs. Ayala was present in the area of the jury assembly room on the second floor.

'First, let me note that our records indicate that Javier Ayala Senior was summoned for jury duty yesterday. I guess it's fair to say we all have to do it from time to time. That may well account for Mrs. Ayala's presence in or near the jury assembly room. In any event, please put these circumstances from your mind, and do not let them influence your deliberations or decisions in any way. Each of you took an oath to render a true verdict according only to the evidence, and I further instructed each of you to decide what happened in this case based only on the evidence that was presented to you during the course of the trial.

'Specifically, do not consider the presence or absence of any witnesses, family members, or other persons associated with the trial in or near the courtroom at any time during the trial, except of course if a witness testified, you may consider their evidence as you were previously instructed.

'To help ensure that you are not otherwise distracted during the course of your deliberations, I've made arrangements for you to park together in a new location. You'll be transported together to the courthouse in the morning, and back to your cars at the end of the day. This is a routine response to your concerns, expressed by one or more of the jurors.

'And you may now resume your deliberations. I know you sent us a question, and we're going to get to that in just a minute . . . [¶] . . . [¶]

'Like I said, we will be able to answer that question for you, probably after lunch. We're going to provide you lunch today, so you can work through lunch or not as you choose. But remember, it's all 12 or none. You have to be together.

'Finally, reminder: If at any time during the trial, you feel that you are unable to decide the case fairly and impartially according to the law and your oath, please let me know, using our existing procedures.'

(Ans., Ex. 6 at 30–32.)

Petitioner claims that the trial court violated his right to a fair and impartial jury. The state appellate court concluded that the trial court acted well within its discretion ("Indeed, had the court conducted a hearing, it may well have created concern where none actually existed"), and rejected Petitioner's claim:

> In the present case, there was no suggestion that either Ortiz or Benita Ayala had said anything to any of the jurors or made any gestures. At worst, they were alleged to have been "watching" the jurors. And there was an entirely innocent explanation for Benita Ayala's presence in the jury assembly area. This is far less troubling than the cases defendants cite, where the tampering

> involved an anonymous telephone call in which the caller told the juror, "I know where you live" [citation omitted] and where one juror was repeatedly approached outside the courthouse, promised cash, a job and a new car if he voted to acquit one of the two defendants [citation omitted]. We do not assume, without more, that a juror's safety concerns demonstrate bias either for or against a defendant. [Citation omitted.]
>
> The trial court quite reasonably worried that if it were to question the jurors about the incidents it would make the incidents seem more ominous than the jury actually believed them to be. That the jury was not overly concerned is evidenced by the fact that, even as the court and counsel were discussing the issue, the jury had resumed its deliberations and had submitted a question related to the substance of the deliberations and unrelated to the fears the jury had communicated to the bailiff the night before. To the extent that the presence of a defense witness made some of the jurors fearful, the court's safety measures — the morning and evening escort and the opportunity to work through lunch — were designed to quell those fears.
>
> The court's admonition avoided stirring up further fears by assuring the jury that the safety measures were routine and intended to eliminate distractions. It also gave the jury a completely innocent explanation for Benita Ayala's presence in the jury area. Finally, the trial court instructed the jury to inform the court if, at any time, "you feel that you are unable to decide the case fairly and impartially." Absent any further indication of concern from the jury, we presume the jury was able to follow the admonitions it was given. [Citation omitted.]

(*Id.* at 33–34.)

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523–24 (9th Cir. 1990) (internal quotations omitted). Due process requires that the defendant have a jury capable and willing to decide the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

Due process does *not* require, however, that the trial court hold a hearing every time there is evidence or a question of juror bias. *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003). Rather, a case-by-case determination is appropriate. "[I]n determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness

of the alleged misconduct or bias, and the credibility of the source." *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir.1993) (Lay, J., concurring).

Petitioner's claim cannot succeed. First, the mere fact that the trial court did not hold a hearing does not violate any clearly established federal right. *See Tracey*, 341 F.3d at 1044. Second, the state appellate court reasonably determined that the trial court's decision not to hold a hearing did not violate Petitioner's rights. As noted above, (1) the jurors never indicated that they could not be fair or impartial, but rather registered their fears about Ortiz and Benita, (2) the encounters with Ortiz and Benita were brief and of ambiguous meaning; (3) the trial court acted to calm such fears by giving reasonable explanations for Benita's presence in the courthouse and by having the jurors escorted to their cars, (4) after the court spoke with the jurors, they never raised the issue of their fears, and in fact, appeared to resume fair and impartial deliberations, and (5) the jurors were instructed to inform the court if any one of them could not be fair and impartial. On such a record, the state appellate court's determination was reasonable. Furthermore, jurors are presumed to follow their instructions, *see Richardson v. Marsh*, 481 U.S. 200, 206 (1987). This Court, then, must presume that the jury discounted their fears and adhered to their instructions to be fair and impartial. Petitioner has not overcome this presumption. Accordingly, this claim is DENIED.

**II.     Jury Instructions**

Because it was stipulated that Diaz was the shooter, the prosecutor had to rely on vicarious theories of liability to try Petitioner and Ayala for the killing of Jimenez, here the "natural and probable consequences" doctrine. The trial court issued instructions on this doctrine, telling the jurors that "defendants could be guilty of murder or attempted murder, even if their intent was to aid and abet only disturbing the peace, fighting or challenging someone to fight, simple assault, or aggravated assault, if the more serious crimes were the natural and probable consequence of the less serious crimes." (Ans., Ex. 6 at 14.) Petitioner raises two jury instructions claims, (A) & (B).

### A. Liability for First Degree Murder

Petitioner claims that he could not permissibly be found guilty of first degree murder unless the jury found that *first* degree murder was a natural and probable consequence of the underlying crimes.

Under California law,

> a trial court has the *sua sponte* duty, when a defendant's liability for first degree murder is as an accomplice under a natural and probable consequences theory, to instruct the jury that it must determine whether premeditation and deliberation, as it relates to the murder, was a natural and probable consequence of the target crime. The duty arises, however, only when the evidence would support a finding that a lesser degree of murder was foreseeable and that the greater degree of the crime was not foreseeable.

(*Id.* at 19–20.) The state appellate court concluded that the trial court's duty to give such an instruction for Petitioner was at best "questionable":

> [Petitioner] directly participated in the planned attack upon the victims — singling them out, following them through the park, falsely posing as a Sureño, consulting with Diaz in the bushes, assaulting one while Diaz shot the other, then either attempting to shoot Luis or assisting Diaz in the attempt. Under those circumstances, no reasonable jury could find that unpremeditated second degree murder was reasonably foreseeable but that first degree murder (premeditated or by lying in wait) was not.

(*Id.* at 20.)

Petitioner's claim is without merit. His claim is essentially that the trial court did not *sua sponte* instruct on lesser-included homicide offenses. The failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).

Under circuit law, however, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." *Id.* at 929 (citation omitted). However, Petitioner is not entitled to relief under this putative exception. First, circuit precedent does not constitute clearly established federal law under AEDPA. *Renico v. Lett*, 130 S. Ct. 1855, 1865–66 (2010). Second, even if *Solis* applied, it requires that there must be substantial evidence to warrant Petitioner's desired instruction.

*See id.* at 929–30. The evidence cited by the state appellate court shows that Petitioner was active in the criminal events leading to the death of Jimenez. The record, then, defeats any claim that Petitioner's theory of the case constituted an exception to the general rule. This claim is DENIED.

### B. Liability Based on Aiding and Abetting Misdemeanor Offenses

Petitioner claims that the instructions violated his right to due process because it allowed the jury to find that murder, a crime requiring "malice aforethought," was a natural and probable consequence of his aiding and abetting the misdemeanor crimes of simple assault and breach of the peace. The state appellate court rejected this claim as a misunderstanding of the natural and probable consequences doctrine:

> [Petitioner's] argument misses the salient point of the natural and probable consequences doctrine. "'[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury.'" [Citation omitted.] It follows that the jury was not required to find [Petitioner] shared Diaz's intent to kill in order to find [him] guilty of murder and attempted murder under the natural and probable consequences doctrine.
> . . . .
> [A]lthough murder (or attempted murder) may not always be a natural and probable consequence of a simple assault [citation omitted], under certain factual situations, particularly in the gang context, a jury is entitled to find that it was [citations omitted].

(Ans., Ex. 6 at 16–17.)

Petitioner alleges that the instruction offended due process because it was in conflict with the state law requirement that malice aforethought was required for a finding of murder, such malice not being inferable from his aiding and abetting the commission of misdemeanors. Such claim is a matter of state law, violations of which are not remediable on federal habeas review, even if state law were erroneously interpreted or applied. *See*

*Swarthout v. Cooke*, 131 S. Ct. 859, 861–62 (2011). Furthermore, this Court is bound by the state appellate court's determination that the instruction correctly stated the law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Spivey v. Rocha*, 194 F.3d 971, 977 (9th Cir. 1999) (denying habeas relief on claim that aiding and abetting a misdemeanor was a misstatement of the law). Accordingly, Petitioner's claim is DENIED.

## III. Assistance of Counsel

Petitioner claims that defense counsel rendered ineffective assistance by failing to object to the state expert witness's opinion that the crime was planned. According to Petitioner, such opinion implied that he possessed murderous intent sufficient to prove his guilt of first degree homicide. The relevant facts are as follows:

> The challenged testimony in this case came in the course of the prosecutor's exploration of the gang allegation. The prosecutor proposed a lengthy hypothetical based upon the prosecution's version of the events [ ]. The prosecutor then proceeded to establish the expert's opinion as to whether, as alleged in the indictment, the murder [ ], "under these circumstances" would "benefit the criminal street gangs" VMF and VNC.[4] Based upon the circumstances described by the prosecutor and his own understanding of gang culture and the level of trust that existed among gang members, [the gang expert] opined that the crimes had been planned in advance and were committed at the direction of the gang.

(Ans., Ex. 6 at 22–23.)

The state appellate court reasoned that no objection was needed. The expert gave his opinion on a hypothetical situation, not his opinion on the defendants' "individual knowledge and intent." Furthermore, the trial court prevented any prejudice by continually issuing admonitions regarding the expert. For example:

> [E]arly on during the direct examination of [the expert witness], the trial court overruled an objection, stating, 'The jurors may place whatever value on the expert's opinion they choose.' Later, after overruling another defense objection, the court gave the jury a four paragraph admonition, concluding, 'Experts' opinions may be worth nothing, they may be worth everything, or something in between. Ultimately the value that you place on an expert's

---

[4] Sc. the Vario Meadow Fair and the Vario Norte Catorce gangs. They "are 'sister' Norteño gangs in the San Jose area. The two gangs are on friendly terms and their members often socialize together. [Petitioner] and Ayala belonged to VMF. Diaz was a member of VNC." (Ans., Ex. 6 at 4.)

opinion is entirely for you to decide.'

(*Id.* at 24.)

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, the petitioner must establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687–68, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland*, 466 U.S. at 690 ). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 787 (quoting *Strickland*, 466 U.S. at 689). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citing *Strickland*, 466 U.S. at 693).

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). Habeas relief may be granted, however, only if there are no permissible inferences that the jury may draw from the evidence. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

It is "well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir.

2004). Although "[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact." *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990).

Petitioner's claim fails. The state appellate court reasonably determined that there was no ineffective assistance. It was a reasonable tactical decision to decline to object, considering that the expert witness did not opine as to Petitioner's guilt, but rather responded to a hypothetical. Furthermore, there was no prejudice. The trial court repeatedly instructed the jurors as to how to regard expert witness testimony, as noted above. Jurors are presumed to follow their instructions. *Marsh*, 481 U.S. at 206. Accordingly, this claim is DENIED.

Relief is also precluded because, per *Jammal*, the jurors could have drawn the permissible inference as to how gangs are thought to behave. Furthermore, Petitioner cannot obtain relief because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Petitioner's claim is DENIED.

### IV.   Admission of Gang Evidence

Petitioner claims that the trial court violated his right to due process by allowing the prosecutor to admit "evidence of Diaz's cell phone entry for [Petitioner] labeled as "Hitman," [Petitioner's] "Fuck the World" tattoo, and the Nuestra Familia document [Petitioner] possessed during trial."[5]

This evidence was relevant to the "prosecution's overall theory [ ] that [Petitioner] and Ayala were members of a gang that had planned the crimes in retaliation for a prior attack upon a fellow gang member." The state appellate court found the evidence relevant, and rejected this claim:

---

[5] "While the trial was in progress, [Petitioner] was found in possession of a handwritten document that explained the history of the Nuestra Familia prison gang and described the Sureños as enemies of the Norteños." (Ans., Ex. 6 at 10.)

> All the evidence [Petitioner] challenges was relevant in that it established his gang involvement. The cell phone entry showed that [Petitioner] had a nickname and it was established at trial that gang members used nicknames. The tattoo reflected an antisocial attitude that was common among gang members. The Nuestra Familia document confirmed that, for Norteños, Sureños were the enemy. It supported the inference that [Petitioner] had a continued interest in the Norteño lifestyle, which reinforced evidence that [Petitioner] was a committed gang member and committed the crimes as part of a plan to retaliate against the sworn enemies of his gang.

(Ans., Ex. 6 at 25.) The court rejected as unpersuasive Petitioner's allegations that "Hitman" was prejudicial:

> This is, at best, an exaggeration. As the trial court observed, "Who knows why people adopt nicknames." "Hit," is used colloquially both as a noun and as a verb in a variety of contexts. For example, "Hitman" could easily have referred (in Diaz's mind) to a history of asking for things, as in hitting on someone for a favor. The word is not as inherently prejudicial as defendant maintains.

(*Id.* at 25–26.)

As to the tattoo, the state appellate court concluded that any possible prejudice was eliminated by the trial court's instructions that such evidence was not admitted to show "whether or not the person who wears such a tattoo is a good or bad person but only to provide some factual background from which you might get some expert testimony about what the tattoos might signify . . . In other words, it's not character evidence." (*Id.* at 26.)

Petitioner's claim cannot succeed. First, there is no question that the evidence was relevant — it provided evidence of motive and intent. Second, the state appellate court reasonably determined that no prejudice resulted. Its explanation of the use of nicknames and the Nuestra Familia document is plausible and supported by the record. Third, Petitioner has not shown prejudice. The evidence was cumulative of other significant evidence of gang association. An unexhaustive list of such evidence would include the following: (1) Luis testified that Petitioner and the others pretended to be Surenos (and his testimony on this topic was corroborated by eyewitness Diana); (2) Jose Aguilar, who lived in a house popular

as a gang gathering place and who drove Petitioner and Diaz to the park,[6] overheard Diaz and Ayala discuss their intentions to beat up or kill rival gang members; and (3) Jonathan Pipkin, a friend of many Norteño gang members, testified that he heard Diaz discuss gang retaliation while at a meeting with Ayala and Petitioner. Petitioner even admits that his gang associations were established by other evidence, and that defense counsel did not dispute his gang membership. (Pet. at 20 and 24.) Fourth, as noted above, relief is precluded because there is no clearly established law holding that the admission of prejudicial or irrelevant evidence can be the basis for issuance of the habeas writ. *Holley*, 568 F.3d at 1101. Petitioner's claim is DENIED.

## CONCLUSION

The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED. A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals. The Clerk shall enter judgment in favor of Respondents and close the file.

**IT IS SO ORDERED.**

DATED: August 23, 2012

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[6] The record indicates that Aguilar knew nothing about the planned attack that day. (Ans., Ex. 6 at 5.)